No. 24-1985
In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE; JORDAN JORRITSMA;
EMERSON SILVERNAIL,

     Plaintiffs-Appellants,

v.

JOCELYN BENSON, in her official capacity as Michigan Secretary of
State; JONATHAN BRATER,

     Defendants-Appellees.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Jane M. Beckering

**BRIEF FOR DEFENDANTS-APPELLEES**

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-
Appellees
Civil Rights & Elections Division
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659

Dated:  March 4, 2025

# TABLE OF CONTENTS

Page

Table of Authorities..................................................................... iii

Statement in Support of Oral Argument.................................................viii

Jurisdictional Statement............................................................1

Statement of Issues Presented.................................................2

Introduction................................................................................3

Statement of the Case ................................................................5

    A.    Overview of the National Voter Registration Act's list maintenance requirements. ....................................................5

    B.    Michigan's general program for the removal of ineligible voters from the official list of registered voters. ................................................................................ 11

        1.    Program for removing deceased voters ....................... 11

        2.    Program for removing voters who have changed address ....................................................................... 13

        3.    Michigan's program will remove over one million voters from its registration list...................................17

    C.    Plaintiffs-Appellants' notice of violation ............................. 19

    D.    Defendants' response to Plaintiffs' notice.............................20

    E.    The lower court proceedings ................................................25

Standard of Review ..................................................................26

Summary of Argument.............................................................28

Argument....................................................................................32

I. Because Plaintiffs lack individual or organizational standing, their claim was properly dismissed. ............................ 32

    A. The individual Plaintiffs' alleged election integrity and vote dilution injuries are speculative, generalized non-cognizable grievances. ........................................... 33

    B. The RNC did not allege a cognizable diversion-of-resources injury. ................................................... 41

II. Plaintiffs failed to state a plausible claim for relief under the NVRA. .................................................................... 50

    A. Plaintiffs failed to state a viable claim that Michigan has failed to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official voter lists. ............................................. 50

    B. Defendants' response letter further showed that Plaintiffs failed to state a plausible claim for a violation of the NVRA. ......................................... 61

Conclusion and Relief Requested ........................................... 66

Certificate of Compliance ..................................................... 67

Certificate of Service ............................................................ 68

Designation of Relevant District Court Documents .............................. 69

# TABLE OF AUTHORITIES

Page

## Cases

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) .............................................................................. 27, 57

*Am. Copper & Brass, Inc. v. Lake City Indust. Prods.,* 757 F.3d 540 (6th Cir. 2014).................................................................................. 42

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................ 27, 57, 60

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426 (6th Cir. 2008) ......................................................................................... 61, 63

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................... 27, 60

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019)................................. 52

*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020) ....... 43

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .............................. 45

*Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912 (6th Cir. 2002) ............................................................................................. 32

*Coyne v. Amer. Tobacco Co.*, 183 F.3d 488 (6th Cir. 1999)................... 32

*Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. 2020) .................................. 19

*Diamond v. Charles*, 476 U.S. 54 (1986)............................................... 35

*Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331 (W.D. Pa. 2020)........................................................................ 36

*FDA v. All. For Hippocratic Med.,* 602 U.S. 367 (2024) .................. 44, 48

*Glennborough Homeowners Ass'n v. United States Postal Serv*, 21 F.4th 410 (6th Cir. 2021)................................................................. 34

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)........................... 41

*HDC, LLC v. Ann Arbor*, 675 F.3d 608 (6th Cir. 2012) .......................... 60

*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007) ......... 34

*Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021) ................................... 36

*Husted v. A. Philip Randolph*, 138 S. Ct. 1833 (2018) ............................. 8

*Jama v. Dep't of Homeland Security,* 760 F.3d 490 (6th Cir. 2014) ....... 26

*Johnson v. Bredesen*, 356 F. App'x 781 (6th Cir. 2009) .......................... 36

*Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Col. 2021) .................................................................................. 38, 39, 41

*Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.,* 34 F.4th 988 (11th Cir. 2022) ................................................................... 35

*Lance v. Coffman*, 549 U.S. 437 (2007) .................................................. 35

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................. 32, 41

*Lyshe v. Levy*, 854 F.3d 855 (6th Cir. 2017) ........................................... 26

*Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ............................... 39, 40

*McGlone v. Bell,* 681 F.3d 718 (6th Cir. 2012) ...................................... 26

*O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742 (D. Colo. Apr. 28, 2021) ....................................... 37

*Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021) 45, 46

*Prime Media, Inc. v. City of Brentwood,* 485 F.3d 343 (6th Cir. 2007) ....................................................................................... 26

*Public Interest Legal Foundation v. Boockvar*, 495 F. Supp. 3d 354 (M.D. Penn., Oct. 20, 2020) ................................................................. 54

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir. 1996) .............................................................................. 26

*RNC v. N.C. Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) ................ 48

iv

*Rogers v. Stratton Indus.*, 798 F.2d 913 (6th Cir. 1986).........................26

*Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673 (6th Cir. 2011)........61

*Santos v. Dist. Council of N.Y.C. & Vicinity of United Brotherhood of Carpenters & Joiners of Am., AFL-CIO*, 547 F.2d 197 (2d Cir. 1977) .................................................................................................35

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ...........................................................................................34, 41

*Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977 (6th Cir. 2020) ...........................................................................................43

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016).......................................32

*Swanigan v. FCA US LLC*, 938 F.3d 779 (6th Cir. 2019) ......................42

*Taylor v. KeyCorp.*, 680 F.3d 609 (6th Cir. 2012) .................................32

*Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888 (6th Cir. 2024) ...........................................................................................44, 45

*Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008)...........................................27, 57

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)......................................33

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ..............................61

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) ...................................33, 34

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020)......................37

**Statutes**

Mich. Comp. Laws § 168.1 ......................................................................11

Mich. Comp. Laws § 168.492a...................................................................6

Mich. Comp. Laws § 168.509...................................................................10

Mich. Comp. Laws § 168.509aa.................................................... 15, 22, 64

Mich. Comp. Laws § 168.509aa(1) ............................................... 15

Mich. Comp. Laws § 168.509aa(4) ............................................... 15

Mich. Comp. Laws § 168.509aa(5) ............................................... 15, 22

Mich. Comp. Laws § 168.509dd(1) ............................................... 17

Mich. Comp. Laws § 168.509dd(3) ............................................... 17

Mich. Comp. Laws § 168.509ff(1) ................................................ 16

Mich. Comp. Laws § 168.509m .................................................... 11

Mich. Comp. Laws § 168.509o..................................................... 10, 12

Mich. Comp. Laws § 168.509o(5) ................................................. 14

Mich. Comp. Laws § 168.509p .................................................... 10

Mich. Comp. Laws § 168.509q..................................................... 10

Mich. Comp. Laws § 168.509r..................................................... 10

Mich. Comp. Laws § 168.509r(5).................................................. 16

Mich. Comp. Laws § 168.509r(7).................................................. 16

Mich. Comp. Laws § 168.509r(8).................................................. 16

Mich. Comp. Laws § 168.509z(a) ................................................. 14

Mich. Comp. Laws § 168.509z(b) ................................................. 14

Mich. Comp. Laws § 168.510...................................................... 12

Mich. Comp. Laws § 169.509aa(3) ............................................... 21

Mich. Comp. Laws § 333.2815.................................................... 12

Mich. Comp. Laws § 333.2833.................................................... 12

Mich. Comp. Laws § 333.2804(4) ........................................................ 12

Mich. Comp. Laws § 168.509n ........................................................... 11

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1294(1) ............................................................................... 1

52 U.S.C. § 20507(a)(2) ......................................................................... 5

52 U.S.C. § 20507(a)(3) ......................................................................... 6

52 U.S.C. § 20507(b)(1) ......................................................................... 6

52 U.S.C. § 20507(b)(2) ......................................................................... 7

52 U.S.C. § 20507(c)(1) ......................................................................... 8

52 U.S.C. § 20507(d)(1) ......................................................................... 9

52 U.S.C. § 20507(d)(3) ......................................................................... 9

52 U.S.C. § 20510(b)(1) ....................................................................... 33

52 U.S.C. § 21083(a)(2)(B)(ii) ........................................................... 10

## Rules

Fed. R. App. P. 26(a)(1)(A) .................................................................. 1

Fed. R. App. P. 3(a)(1) .......................................................................... 1

Fed. R. App. P. 4(a)(1) .......................................................................... 1

Fed. R. Civ. P. 12(b)(1) ................................................................. 1, 32

Fed. R. Civ. P. 12(b)(6) ................................................................. 1, 58

## Constitutional Provisions

Mich. Const. 1963, art. II, § 2 ............................................................. 6

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellants Republican National Committee, Jordan Jorritsma, and Emerson Silvernail request oral argument.  However, Defendants-Appellees Michigan Secretary of State Jocelyn Benson and Director of Elections Jonathan Brater do not request oral argument because they believe that oral argument is unnecessary for the Court to decide the issues presented in this appeal of the district court's well-reasoned opinion, and that the issues raised in this appeal are reasonably resolved by both recent and long-established law.

## JURISDICTIONAL STATEMENT

On October 22, 2024, the district court dismissed the case under
Fed. R. Civ. P. 12(b)(1) for lack of standing and under Fed. R. Civ. P.
12(b)(6) for failure to state a claim.  (R. 35, Page ID # 30.)  Plaintiffs
filed a notice of appeal on November 8, 2024, (R. 37, Page ID # 1), which
was timely under Fed. R. App. P. 3(a)(1), 4(a)(1), and 26(a)(1)(A)–(C).
This Court has appellate jurisdiction under 28 U.S.C. §§ 1291, 1294(1).

## STATEMENT OF ISSUES PRESENTED

1.  Whether the District Court correctly concluded that the individual Plaintiffs lacked standing where they failed to present any actual injury-in-fact and instead relied on generalized concerns and subjective fears?

2.  Whether the District Court correctly concluded that the Republican National Committee (RNC) lacked organizational standing where the RNC failed to demonstrate that Defendants' supposed violation of the NVRA caused a "diversion of resources," and instead relied on hypothetical future spending and costs the RNC allegedly incurred investigating whether Defendants were complying with the NVRA?

3.  Whether the District Court correctly concluded that Plaintiffs failed to state a plausible claim under the NVRA where they failed to identify a single ineligible voter on Michigan's voter rolls and they failed to show that Michigan's voter list maintenance program was unreasonable?

**INTRODUCTION**

This appeal is not about whether the Republican National Committee (RNC) or individual voters can *ever* have standing or state a claim under the National Voter Registration Act (NVRA)—the issue is whether they failed to do so here based on the minimal allegations they provided in their complaint.

From its inception, this case has always been a curiosity for what it did not include. Absent from the complaint were plain allegations of concrete, particularized harms to Plaintiffs; or a clearly articulated statement of the relief sought; or direct factual allegations showing how Michigan's voter list maintenance program fell below the "reasonable effort" required by the NVRA. Plaintiffs even failed to make allegations refuting the Director of Elections' letter disputing Plaintiffs' claims, or to even acknowledge that letter. The sparseness of the complaint is all the more odd in light of the opportunity the court gave Plaintiffs to amend their complaint in response to Defendants' motion to dismiss.

Whatever their reasons, Plaintiffs' attempt to get by with bare allegations simply fell short. *First*, the individual Plaintiffs failed to establish standing because they relied entirely on allegations of

3

subjective fears and a generalized "lack of confidence" in elections that could just as easily be asserted by every Michigan citizen. *Second*, the RNC, for its part, staked its claim to standing on a "diversion of resources" theory that is no longer viable in the face of recent decisions from both the Supreme Court and this Court. While the RNC attempts in this appeal to reframe its standing, those arguments fail because their allegations simply do not support them. As a result, the complaint was correctly dismissed for lack of standing.

*Third*, Plaintiffs' complaint ultimately fails because it does not state a plausible claim for violation of the NVRA. The complaint does not explain what Defendants have done (or not done) that violates the statute, and the complaint does not defend its core allegations from the Director of Elections' patient explanation and detailed analysis—which was provided at Plaintiffs' request. Instead, Plaintiffs insist that courts are obliged to accept their claims at face value "at the pleading stage." But that is not the correct standard; courts are not obligated to accept Plaintiffs' unsupported conclusions or inferences, and Plaintiffs' complaint was appropriately dismissed because it offered nothing more than that. This Court should affirm.

## STATEMENT OF THE CASE

### A.  Overview of the National Voter Registration Act's list maintenance requirements.

The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters for Federal office," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b). Section 8 of the NVRA, codified in 52 U.S.C. § 20507, provides several procedures or other requirements to be carried out by participating states with respect to the administration of voter registration.  This includes efforts aimed at insuring "each eligible applicant" is registered to vote in an election and taking precautions against hasty removals of registrants from voter rolls.

Section 8 of the NVRA requires a state to notify voters of the disposition of an application for registration, 52 U.S.C. § 20507(a)(2), and prohibits the removal of a name of a registrant except in narrow circumstances, i.e., at the registrant's request, "by reason of criminal

conviction or mental incapacity,"[1] or through a "general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death or upon a change of address.  52 U.S.C. § 20507(a)(3), (4).

The NVRA does not require states to comply with any particular program or to immediately remove every voter who may have become ineligible.  Rather, a state must "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of: (A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of]"  52 U.S.C. § 20507(a)(4)(A)–(B) (emphasis added).

Subsection (b) requires that the program implemented to remove voters under subsection (a)(4) be "nondiscriminatory," 52 U.S.C. § 20507(b)(1), and "shall not result in the removal of the name of any

---

[1] Michigan law prohibits both registering to vote and voting by persons while serving sentences of imprisonment, Mich. Const. 1963, Art. II, § 2, Mich. Comp. Laws §§ 168.492a, 168.758b, but does not require that previously existing registrations be canceled upon incarceration.

person from the official list of voters registered to vote in an election for

Federal office by reason of the person's failure to vote" except:

> (i)    (2) . . . that nothing in this paragraph may be
> construed to prohibit a State from using the procedures
> described in subsections (c) and (d) to remove an
> individual from the official list of eligible voters if the
> individual) has not either notified the applicable
> registrar . . . or responded during the period described
> in subparagraph (B) to the notice sent by the applicable
> registrar; and then

> (B) has not voted . . . in 2 or more consecutive general
> elections for Federal office. [52 U.S.C. § 20507(b)(2).]

With respect to any removal program, however, a state must

generally complete any program to remove voters from official lists not

later than 90 days before a primary or general election for Federal

office:[2]

> (2)(A) A State shall complete, not later than 90 days prior to
> the date of a primary or general election for Federal office,
> any program the purpose of which is to *systematically
> remove* the names of ineligible voters from the official lists of
> eligible voters.

> (B) Subparagraph (A) shall not be construed to preclude

---

[2] For this election cycle, the ninetieth day before the August 6, 2024,
primary was May 8, 2024, and the ninetieth day before the November 5,
2024, general election was August 7, 2024. Given these dates,
systematic removals had to cease by May 8 until after the November
election.

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); . . . . [Emphasis added.]

Subsection (c)(1) sets forth an example of a program for the removal of ineligible voters from the registry that is based on using "change-of-address information supplied by the Postal Service[.]"  52 U.S.C. § 20507(c)(1).  A state *may* comply by utilizing change-of-address information from the United States Postal Service; however, this is not the only way by which a state can achieve compliance.  *Husted v. A. Philip Randolph*, 138 S. Ct. 1833, 1847 (2018).  Thus, under subsection (c), a state may implement a program described in subsection (c)(1), or a state may craft its own voter removal program in order to comply with subsection (a)(4).

Subsection (d) addresses the removal of names from the official registration list.  Subsection (d)(1) sets forth a prohibition with two exceptions.  The statute prohibits a state from removing the name of a registrant on the grounds of a change of residence unless one of two situations exists:  *First*, where the registrant confirms in writing that the registrant has moved out of the registrar's jurisdiction.  *Second*, where the registrant fails to respond to a specific type of notice sent by

the registrar in conformity with subsection (d)(2), and the registrant has not voted in the previous two general elections following the transmission of the notice to the registrant.  52 U.S.C. § 20507(d)(1)–(2). If a registrar receives change of residence information under (d)(1) and (2), the registrar "shall correct" the voter registration list.  52 U.S.C. § 20507(d)(3).  But if confirmation is not received, there is a time-lag built into the statute before a voter's name may be removed.  Specifically, a state must have written confirmation that the registrant has changed residence to a location outside of his/her jurisdiction, or two federal elections must have passed without the registrant voting during this period of time, the registrant received notice that s/he would be removed from the official voter file if s/he did not confirm an accurate address and registration information.  52 U.S.C. § 20507(d)(1)–(2).

　　In addition to NVRA, the federal Help America Vote Act (HAVA) of 2002 provides that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State. . . ."  52 U.S.C. § 21083(a)(1)(A).  Moreover, § 21083(a)(1)(A)(viii) states

that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." Michigan complied with these requirements long ago when it created the qualified voter file (QVF) as the State's electronic statewide voter registration list. Mich. Comp. Laws §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r. Michigan currently has over 8 million total registered voters (including inactive voters) in the QVF.[3] HAVA further requires that "the list maintenance performed . . . shall be conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list." 52 U.S.C. § 21083(a)(2)(B)(ii). Additionally, § 21083(a)(4)(B) of HAVA provides that "the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." The HAVA provisions essentially parallel or incorporate NVRA.

---

[3] *See* Dep't of State, Bureau of Elections, Voter registration statistics, available at Voter registration statistics (state.mi.us) (accessed February 25, 2025).

**B.    Michigan's general program for the removal of ineligible voters from the official list of registered voters.**

After NVRA was enacted, Michigan made a significant number of amendments to the Michigan Election Law, Mich. Comp. Laws § 168.1 *et seq.*, to incorporate or come into compliance with its requirements. Most of these changes to the law originated in 1994 P.A. 441.[4]  Section 509n makes the Secretary of State responsible for coordinating the requirements under NVRA.  Mich. Comp. Laws § 168.509n.  The Department of State's website includes a comprehensive description of Michigan's list maintenance activities.[5]

**1.    Program for removing deceased voters**

With respect to the removal of deceased voters, section 509o requires the Secretary of State to "develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's

---

[4] *See generally*, Mich. Comp. Laws §§ 168.509m, 509n, 509o, 509p, 509q, 509r, 509t, 509u, 509v, 509w, 509x, 509z, 509aa, 509bb, 509cc, 509dd, 509ee, 509ff, and 509gg.

[5] *See* Dep't of State, Voter registration cancellation procedures, available at Voter registration cancellation procedures (michigan.gov) (accessed February 24, 2025).

or chauffeur's license . . . or an official state personal identification card

. . . of a deceased resident of this state is also used at least once a month

to update the qualified voter file to cancel the voter registration of any

elector determined to be deceased."  Mich. Comp. Laws § 168.509o(4).

The Secretary must also "make the canceled voter registration

information . . . available to the clerk of each city or township to assist

with the clerk's obligations under section 510."  (*Id*.)  Under section 510,

"[a]t least once a month, the county clerk shall forward a list of the last

known address and birth date of all persons over 18 years of age who

have died within the county to the clerk of each city or township within

the county.  The city or township clerk shall compare this list with the

registration records and cancel the registration of all deceased electors."

Mich. Comp. Laws § 168.510.  County clerks act as the local registrar

for purposes of maintaining vital records and statistics, such as deaths.

Mich. Comp. Laws §§ 333.2804(4), 333.2815, 333.2833.  Based on these

laws, each week the Michigan Department of State uses information

from the Social Security Death index to cancel the records of individuals

in the QVF who have died.[6]  The state also uses death information received from the Electronic Registration Information Center (ERIC), a bipartisan group of states and Washington, DC, who share voter registration data with each other for the purpose of keeping voter rolls complete, up to date, and accurate.[7]

The District Court recently had occasion to review Michigan's program for removing deceased voters from the QVF and concluded that it was reasonable and rejected a challenge that it violated the NVRA. *See Public Int. Legal Found. v. Benson*, 721 F. Supp. 3d 580 (W.D. Mich. 2024), appeal filed, *Public Int. Legal Found. v. Benson*, 6th Circuit Case No. 24-1255.

### 2.    Program for removing voters who have changed address

As to changes of address, section 509z requires the Secretary to "notify each clerk of the following information regarding residents or former residents of the clerk's city or township . . . [d]river license or state personal identification card changes of address received by the

---

[6] *See* Dep't of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (accessed February 24, 2025.)
[7] *Id.*

secretary of state, and whether the person submitted an application for the new address." Mich. Comp. Laws § 168.509z(a). The Secretary must also provide the "names and addresses in this state of persons who have been issued a driver license in another state." Mich. Comp. Laws § 168.509z(b). These sections are consistent with section 509o(5), which requires the Secretary to "participate with other states in 1 or more recognized multistate programs or services . . . to assist in the verification of the current residence and voter registration status of electors." Mich. Comp. Laws § 168.509o(5). The Secretary must then "follow the procedures under section 509aa(5) with regard to any electors affected by information obtained through any multistate program or service." (*Id.*) As with deceased voters, the Department of State receives information from ERIC that a voter has registered in another state, which information is used to commence the cancellation process for that voter.[8]

Under section 509aa, a "clerk may use change of address information supplied by the United States postal service or other

---

[8] *See* Dep't of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (accessed February 25, 2024).

reliable information received by the clerk that identifies registered voters whose addresses may have changed as provided in this section." Mich. Comp. Laws § 168.509aa(1).  Section 509aa goes on to provide for how a clerk must proceed if the clerk receives "reliable information" that a voter has "moved his or her residence" either "within the city or township," § 509aa(2)(a)-(c), or "to another city or township," § 509aa(3)(a)-(c).  In both cases, the voter must be sent a notice that requests the voter to verify or correct the address information within 30 days before the next election.  If notices are returned as undeliverable to the issuing clerk under either § 509aa(2) or (3), "the clerk shall identify the registration record of a voter as challenged[.]"  Mich. Comp. Laws § 168.509aa(4).  Similarly, subsection 509aa(5) provides that "[i]f the department of state receives notice that a registered voter has moved out of state by receiving a surrendered Michigan driver license of that registered voter, the secretary of state shall send" to the voter notice that requests the voter to verify or correct the address information within 30 days before the next election.  Mich. Comp. Laws § 168.509aa(5).  For voters who receive notices under § 509aa(3) (in-state move to another jurisdiction) or § 509aa(5) (out-of-state move), the

voters must receive information that their registrations will be cancelled after the second November general election after which the notice was sent.[9]  The sending of these notices to these voters starts the cancellation countdown clock running.[10]

Section 509r(5) further provides that the Secretary must create and maintain "an inactive voter file."  Mich. Comp. Laws § 168.509r(5). Section 509r(6) provides that voters who fail to vote for 6 years or confirm residency information must be placed in the inactive file.

However, "[w]hile the registration record of an elector is in the inactive voter file, the elector remains eligible to vote and his or her name must appear on the precinct voter registration list."  Mich. Comp. Laws § 168.509r(7).  But if a voter on the inactive voter file "votes at an election by absent voter ballot, that absent voter ballot must be marked in the same manner as a challenged ballot . . . ."  Mich. Comp. Laws § 168.509r(8).

---

[9] A list of voters who have received notices under section 509aa must be made available for inspection by the Secretary and/or local clerks. Mich. Comp. Laws § 168.509ff(1)–(2).
[10] *See* November 2024 Election Officials' Manual, Chapter 2, Voter Registration, pp 28-35, available at https://www.michigan.gov/documents/sos/II_Voter_Registration_265983_7.pdf (accessed February 25, 2025).

In addition, local clerks are authorized to conduct programs to remove names from the QVF.  Section 509dd provides that a "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township."  Mich. Comp. Laws § 168.509dd(1).  Such a program must be uniformly administered and comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals done at the request of the voter, upon the death of a voter, or upon notice that the voter has moved and registered in a different jurisdiction.  Mich. Comp. Laws § 168.509dd(1), (2)(a)–(c).  To conduct a removal program, a local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, participate "in the national change of address program established by the postal service," or use "other means the clerk considers appropriate."  Mich. Comp. Laws § 168.509dd(3).

### 3. Michigan's program will remove over one million voters from its registration list.

Since 2019 the Bureau of Elections, in conjunction with local clerks, have engaged in rigorous list maintenance practices under the

17

Secretary of State's supervision.[11]  As of March 2024, more than 800,000 voter registrations have been cancelled.[12]  This includes 532,513 registrations of deceased voters, 273,609 registrations of voters who received the required notice under NVRA, and 16,716 registrations of voters who requested to have their own records cancelled.[13]  And as of the date of this brief, another 327,176 voters are slated for cancellation in 2025, and 265,986 voters are slated for cancellation in 2027.[14]  These numbers will continue to climb upward as more voters are added to the cancellation lists.  The large numbers of cancellations slated for 2025 are largely attributable to a statewide election mailing conducted by Secretary Benson in 2020—the first such effort by a Secretary of State in over a decade.[15]  Indeed, in recognition of the Secretary's commitment to robust list maintenance, the plaintiff in a similar NVRA

---

[11]  *See* Dep't of State, [Voter registration cancellation procedures (michigan.gov)](michigan.gov) (accessed February 25, 2025).

[12] *Id.*

[13] *Id.*

[14]  *See* Dep't of State, [Voter registration statistics (state.mi.us)](state.mi.us) (accessed February 25, 2025.)

[15]  *See* Dep't of State, [Voter registration cancellation procedures (michigan.gov)](michigan.gov) (accessed February 25, 2025).

lawsuit filed in 2020 agreed to dismiss his case.  (R. 19-2, Page ID #
307–310, Def's MTD, Ex. 1, 2/16/21 Stipulation of Dismissal, *Daunt v.
Benson*, 1:20-cv-522 (W.D. Mich. 2020)).

### C.  Plaintiffs-Appellants' notice of violation

In their complaint before the District Court, Plaintiffs-Appellants
RNC, Jordan Jorritsma, and Emerson Silvernail (Plaintiffs) identified
the notice provided to Secretary of State Jocelyn Benson and Director of
Elections Jonathan Brater (Defendants) under NVRA as being a letter
sent on December 8, 2023.  (R. 1, Page ID # 17–18, ¶¶ 83–90.)  Plaintiffs
attached a copy of the letter as Exhibit A to their complaint.  (*Id.*, Page
ID # 17, ¶ 83; R.1-1, Page ID # 22–28.)  Plaintiffs alleged that the letter
notified Defendants of "78 Michigan counties that are in violation of
section 8," and requested that Defendants "correct the violations within
90 days."  (R. 1, Page ID # 17, ¶ 83.)

In Section II of their letter, Plaintiffs described the basis for their
complaint, stating that "Comparing the registered active voter count to
the 2021 Census data reveals that these 55 counties have voter
registration rates at or above 100 percent," and the letter then listed
each of the 55 counties with purported percentages of voter registration

at or over 100 percent. (R. 1-1, Page ID # 25–26.) Plaintiffs further claimed that an additional 23 counties had "registration rates of 90 percent or greater," and similarly listed 23 counties with registration rates supposedly no less than 95 percent. (*Id.*, Page ID # 26.) Plaintiffs' letter concluded that, "Discrepancies on this scale cannot be attributed to above-average voter participation and instead point to a deficient list maintenance." (*Id.*) Plaintiffs' letter asked that Defendants "respond in writing within 45 days of the date of this letter." (*Id.*)

### D. Defendants' response to Plaintiffs' notice

On December 28, 2023—only twenty days after Plaintiffs' letter, and more than three months before Plaintiffs filed this lawsuit— Defendants responded to Plaintiffs' letter. (R. 19-3, Page # 316–320, Defs' MTD, Ex. 2, 12/28/23 NVRA Response Letter.) In that letter, Defendants provided a detailed description of Michigan's general program for the removal of ineligible voters from the state's voter registration list. (*Id.*, Page ID # 317–318, pp 2–3.) In addition, Defendants' response provided specific discussion of steps taken to cancel the registrations of hundreds of thousands of registrations since 2019, including sending absentee ballot applications to every registered

voter in Michigan—the first statewide mailing in at least a decade. (*Id.*, Page ID # 318, p 3.) This mailing allowed state and local election officials to identify a significant number of registered voters who appeared to have changed address. (*Id.*) Any registered voter whose application was returned as undeliverable was sent a confirmation notice to start the cancelation process. (*Id.*) Under both the NVRA and Michigan Election Law, if these registered voters do not respond, vote, or otherwise update their registration information, their voter registration at that location will be canceled following the second November federal election. MCL 169.509aa(3).

Defendants' response stated that, between the November 2020 and November 2022 elections, approximately 400,000 registered voters were sent notices and slated for cancellation in 2025 after the state received reliable information of a change of address. The response stated that this figure was higher than other cycles as a result of absentee ballot applications from the 2020 mailing being returned as undeliverable. (R. 19-3, Page ID # 318, p 3.) Some of these individuals have since been cancelled for other reasons (confirmed change of residency, death, etc.) or been removed from the cancellation list by

confirming residency or engaging in voting activity.  The response letter further stated that the remaining individuals will have their voter registration canceled in 2025 if they do not have any voting activity by the federal November 2024 election or notify the Department of their intent to remain registered at the current address.  (*Id.*)

Further, the response stated that Michigan uses data received from ERIC to update voter registrations.  (*Id.*, Page ID # 319, p 4.) Next, the response letter described Michigan' automatic voter registration law, Mich. Comp. Laws § 168.509aa(5), which provides that the cancellation process is also initiated if a voter surrenders their driver's license or moves out of state.  (*Id.*)  Defendants' response also referred to processes involving the cooperation of the State of Michigan, Social Security Administration, local clerks, and ERIC that identify and cancel the names of deceased and duplicate voters.  (*Id.*)

Of particular relevance to this case, Defendants' response squarely rebutted Plaintiffs' claims about "unusually high" voter registrations and explained that the conclusions in Plaintiffs' letter were not supported by the data.  First, Defendants explained that some of the limitations of using Census data, which "provides a 'snapshot' of where

people are currently living but is not necessarily indicative of where they are legally allowed to be registered to vote." (R. 19-3, Page ID # 319, p 4.) Moreover, the response explained that Plaintiff's methodology for determining the number of registered voters was flawed, and Defendants' response provided accurate percentages:

> Notwithstanding the limitations of using census data to estimate the total eligible population stated above, the total active voter registration number in Michigan is approximately 88 percent of [Plaintiffs'] figure. *Additionally, even using this methodology, and when utilizing the "active" voter registration data available on the Secretary of State's website, none of the counties identified in your letter have active voter registration percentages above 100%.* The actual active voter registration of the counties alleged in your letter to be over 100% is as follows:

| Allegan | 93% | Kalamazoo | 87% | Muskegon | 91% |
|---|---|---|---|---|---|
| Bay | 92% | Kent | 89% | Oakland | 89% |
| Berrien | 90% | Lapeer | 94% | Ottawa | 89% |
| Calhoun | 91% | Lenawee | 86% | Saginaw | 90% |
| Clinton | 91% | Livingston | 95% | St. Clair | 93% |
| Eaton | 91% | Macomb | 91% | Shiawassee | 94% |
| Genesee | 94% | Marquette | 85% | Van Buren | 90% |
| Grand Traverse | 94% | Midland | 91% | Washtenaw | 83% |
| Jackson | 86% | Monroe | 91% | Wayne | 88% |

> *The numbers used by the Republican National Committee include both active and inactive registered voters.* But the State of Michigan cannot remove inactive voters without following the requirements in both NVRA and HAVA. Following the process established in the Michigan Election

Law, in compliance with NVRA, an estimated 521,116 voter registrations will be canceled in 2025.[16]

(R. 19-3, Page ID # 319–320, pp 4–5) (emphasis added) (footnotes omitted).

Despite Defendant's response, on March 13, 2024, Plaintiffs filed this lawsuit. The complaint made no allegations refuting or contradicting Defendants' description of Michigan's removal program, the steps Michigan has taken and will take to remove ineligible voters from Michigan's QVF, or disputing whether the numbers used in Plaintiffs' notice letter included both active and inactive voters.

---

[16] After the date of their response letter, Defendants discovered a display error in the Michigan Voter Information Center website that caused all voters on the cancellation countdown (i.e. those slated for cancellation in 2025 or 2027) to display as being slated for cancellation in 2025. All the voters in that number were indeed slated for cancellation, but not in 2025. While it was not correctly displayed on the website, the information was always correct in Michigan's QVF database. The incorrect number of cancellations slated for 2025 was cited on pages 3 and 5 of Defendants' response. The error on the website has since been corrected, and the information currently displayed is accurate. (https://mvic.sos.state.mi.us/VoterCount/Index) (last accessed February 25, 2025).

### E.    The lower court proceedings

Plaintiffs filed their complaint on March 13, 2024.  (R. 1, Page ID # 1–28.)  Defendants filed their motion to dismiss on April 15, 2024.  (R. 18, Page ID # 261–262; R. 19, Page ID # 263–320.)  On April 16, 2024, the District Court issued an order inviting Plaintiffs to file an amended complaint in response to Defendants' motion, or to respond to the motion within 28 days.  (R. 22, Page ID # 326.)  Plaintiffs thereafter filed their response to Defendants' motion on May 20, 2024.  (R. 27, Page ID # 395–445.)  Defendants filed their reply brief in support of the motion on June 17, 2024.  (R. 30, Page ID # 450–468.)[17]

On October 22, 2024, the District Court entered its opinion and order granting Defendants' motion to dismiss, concluding that Plaintiffs lacked standing and had also failed to state a plausible claim that Defendants had violated the NVRA.  (R. 35, Page ID # 485–514.)  The District Court then entered judgement in favor of Defendants.  (R. 36, Page ID # 515).

---

[17] Two motions to intervene as defendants were filed, *see* R. 9 & R. 12, which the District Court later denied as moot, *see* R. 35, Page ID # 514. The Democratic National Committee also filed an amicus curae brief in support of Defendants' motion.  (R. 24, Page ID # 331–388; R. 34, Page ID # 484.)

## STANDARD OF REVIEW

A lower court's dismissal of a complaint for lack standing is reviewed de novo. *McGlone v. Bell,* 681 F.3d 718, 728 (6th Cir. 2012) (citing *Prime Media, Inc. v. City of Brentwood,* 485 F.3d 343, 348 (6th Cir. 2007)).

Whether a party has Article III standing is properly an issue of a court's subject matter jurisdiction under Rule 12(b)(1). *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1)[,] . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986)) (emphasis omitted).

This Court also reviews de novo a dismissal of a complaint for failure to state claim. *Jama v. Dep't of Homeland Security,* 760 F.3d 490, 494 (6th Cir. 2014). When considering a motion to dismiss for failure to state a claim, although a court should presume that all well-pleaded material allegations of the complaint are true, *see Total*

*Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted). The court need not accept as true legal conclusions or unwarranted factual inferences. *Total Benefits*, 552 F.3d at 434.

To survive dismissal, the plaintiff's claim must be plausible. *Twombly*, 550 U.S. at 555. The inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, in evaluating the sufficiency of a plaintiff's pleadings, the court may make reasonable inferences in the non-moving party's favor, "but [this Court is] not required to draw [P]laintiffs' inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

27

## SUMMARY OF ARGUMENT

There are essentially three issues presented in this appeal.

The *first* is whether the individual Plaintiffs made allegations sufficient to establish their standing. That issue, however, is readily answered by established law. The individual Plaintiffs here made no allegations of any harm that was "distinct and palpable" with respect to them and based on "actual or imminent" alleged harm. Instead, they relied entirely on subjective allegations of fears about potential unlawful voting, and their "confidence" in elections. But such "fears" are the type of psychic injuries that this Court has held fall short of a concrete harm needed to establish Article III standing. Moreover, such fears are the type of generalized grievance that inures to all Michigan residents, and thus fails to demonstrate a particularized injury for purposes of standing. These Plaintiffs also alleged fear of having their legitimate votes diluted by those of ineligible voters. But these allegations similarly failed to allege a theory of vote dilution that was particularized to the individual Plaintiffs as opposed to a generalized grievance that could apply to any voter in Michigan. As a result,

individual Plaintiffs Jorritsma and Silvernail lacked standing and their claims were properly dismissed.

The *second* issue is whether the RNC made allegations sufficient to establish its standing.  Here, the RNC's allegations were clearly aimed at satisfying a "diversion of resources" theory, based largely on the RNC's allegations that it "may" spend more on voter outreach. However, the "diversion of resources" theory of standing has been considerably reduced by decisions from the Supreme Court and this Court.  Perhaps recognizing the deficiency of this approach, the RNC has sought on appeal to restate its claim to standing, now arguing that its "daily operations have been stymied" by the alleged violation of the NVRA.  While that might have been a better argument, it is not supported by the minimal allegations in the complaint, and the RNC simply failed to make allegations showing an injury-in-fact.  Likewise, the RNC's invocation of a possible split with the Fourth Circuit—where that court held that the RNC had standing in the similar case before it—is belied by the Fourth Circuit's opinion itself, which explicitly stated its reliance on factual allegations that are not present here. Perhaps the RNC's claim to standing would have been stronger had it

29

made such allegations, but it did not—and it failed to amend its complaint to do so when given the opportunity by the District Court.

The *third* and final issue is whether Plaintiffs' complaint stated a plausible claim for relief. That question is also readily resolved by well-established precent from this Court and the Supreme Court, including *Iqbal* and *Twombly*. The complaint simply failed to state a plausible claim under the NVRA, and instead relied overmuch on Plaintiffs' own conclusions and restatements of the statutory language. Perhaps most tellingly, Plaintiffs' complaint failed to address or refute Defendants' response to Plaintiffs' NVRA notice letter. There are no allegations in the complaint disputing the facts or analysis of the Director of Elections. In a case alleging a statutory violation, the void left by that omission is especially stark. Simply put, Plaintiffs cannot possibly assert a plausible claim that Defendants have failed to operate a list maintenance program that makes a "reasonable effort" to remove ineligible voters when the complaint ignores Defendants' stated explanation of its program and analysis showing errors in Plaintiffs' statistics.

While Plaintiffs spend much time insisting that the District Court wrongly required them to make specific allegations of flaws in Michigan's list maintenance program, the District Court imposed no such requirement. While the District Court certainly observed the lack of such allegations, its analysis did not stop there. Instead, the District Court went on to note that Plaintiffs' claim rose to little more than a raw conclusion that Michigan's program was "not reasonable." This was followed by the Court's conclusion that such conclusory assertions do not state a plausible claim, and that some factual context was necessary to nudge their statutory violation claim across the line from conceivable to plausible. That is not error—it is a correct statement of the law. Plaintiffs' complaint was thus also appropriately dismissed where it failed to state a plausible claim that Defendants were in violation of the NVRA.

31

## ARGUMENT

### I. Because Plaintiffs lack individual or organizational standing, their claim was properly dismissed.

When plaintiffs lack standing, the Court lacks jurisdiction and dismissal is warranted under Fed. R. Civ. P. 12(b)(1). *Taylor v. KeyCorp.*, 680 F.3d 609, 612–13 (6th Cir. 2012). "[T]he standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into a 'vehicle for the vindication of the value interests of concerned bystanders.' " *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915–16 (6th Cir. 2002) (quoting *Coyne v. Amer. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal citations and quotations omitted)).

A plaintiff can satisfy this requirement only by "clearly . . . alleg[ing] facts demonstrating" that: (1) he suffered an injury-in-fact; (2) such injury is "fairly traceable to the challenged conduct" of a named-defendant; and (3) such injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547–48 (2016) (internal quotations omitted). These elements are "not mere pleading requirements," but an "indispensable part of plaintiff's case[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

The NVRA also includes an additional requirement to invoke this Court's jurisdiction. Specifically, Congress authorized a private cause of action only by a person "aggrieved by a violation of [the NVRA]" and who provides "written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1).

Where, as here, Plaintiffs' allegations failed to satisfy these elements, a court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas,* 495 U.S. 149, 155–56 (1990).

A.    **The individual Plaintiffs' alleged election integrity and vote dilution injuries are speculative, generalized non-cognizable grievances.**

The complaint is void of any factual allegations supporting a finding that Plaintiffs Jorritsma and Silvernail "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)) (internal quotations and citations omitted). Federal courts have "emphasized repeatedly" that the "injury-in-fact" element requires allegations of an injury that is "distinct and palpable" with respect to

33

the plaintiff and based on "actual or imminent" alleged harm.
*Whitmore*, 495 U.S. at 155–56 (internal citations and quotations omitted).  Allegations of a "conjectural, hypothetical or speculative" harm are not sufficient.  *Id.*  Nor is it sufficient to allege an abstract injury which, if it even materialized, would be shared by all citizens. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216–17 (1974).

But here, Plaintiffs Jorritsma and Silvernail asserted only generalized grievances that did not satisfy Article III standing principles.  They first alleged that they "reasonably fear[ ] that ineligible voters can and do vote in Michigan elections," which "undermine[s] their confidence in the integrity of Michigan elections." (R. 1, Page ID # 5, Compl., ¶¶ 19, 22.)

Such a "fear" of unlawful voting, however, is the type of psychic injury that "falls well short of a concrete harm needed to establish Article III standing."  *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021); cf. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 619–20 (2007) (Scalia, J., concurring) (recognizing that a plaintiff whose only injury is subjective

34

mental angst "lacks a concrete and particularized injury" under Article III).  *See also Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.,* 34 F.4th 988, 993 (11th Cir. 2022) ("purely psychic injuries, like disagreeing with government action, are not concrete, so they do not give rise to standing.") (citing *Diamond v. Charles*, 476 U.S. 54, 67 (1986).); *Santos v. Dist. Council of N.Y.C. & Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 547 F.2d 197, 200 (2d Cir. 1977) (explaining that "disappointment" in election results is "an emotional loss insufficient to establish standing" (internal quotation marks and citation omitted)).

Likewise, these Plaintiffs' subjective fear or concern regarding the integrity of Michigan elections is the type of generalized grievance that inures to all Michigan residents, and thus fails to demonstrate a particularized injury for purposes of standing.  *See, e.g., Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (a plaintiff who is "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy."); *Johnson v.*

35

*Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009) ("The Supreme Court has long held that a plaintiff does not have standing 'to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.' "); *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 (5th Cir. 2021) (generalized grievance where "plaintiffs asserted . . . that drive-thru voting hurt the 'integrity' of the election process").

Plaintiffs attempted to support their fears with speculative claims about voter fraud. They cited generic statements concerning voter fraud from courts outside this circuit and the increasingly dated Carter-Baker Commission report's statements that inaccurate voter lists could invite fraud. (R. 1, Page ID # 8–9, ¶¶ 36–37.) But Plaintiffs failed to relate these cases or statements to Michigan's list maintenance programs, or to plausibly allege that voter fraud resulting from poor list-maintenance presently exists in Michigan. Merely invoking "the possibility and potential for voter fraud," based only on "hypotheticals, rather than actual events," simply does not suffice. *Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020). Further, none of the handful of fraud cases in Michigan that

Plaintiffs cite stem from an invalid voter registration, e.g., an ineligible voter casting a ballot because his or her registration had not been cancelled in a jurisdiction as part of routine list maintenance.  (R. 1, Page ID # 9, ¶ 38.)[18]

Plaintiffs Jorritsma and Silvernail also professed fear of having their legitimate votes diluted by those of ineligible voters.  (R. 1, Page ID # 4–5, ¶¶ 18–19, 21–22.)  But these allegations similarly failed to allege a theory of vote dilution that was particularized to these Plaintiffs as opposed to a generalized grievance that could apply to any voter in Michigan.  Numerous courts have already rejected such generalized grievances in support of standing.  *See Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing." (internal quotation omitted)); *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161,

---

[18] *See* Oak Park guardian pleads guilty to voter fraud in 2020 election (detroitnews.com); Attorney General: Macomb County Nursing Home Employee Pleads Guilty in Attempted Election Fraud Case (michigan.gov); Former Sterling Heights candidate admits to falsifying absentee-voter ballots – Macomb Daily (accessed February 25, 2025).

37

2022 WL 1699425 (10th Cir. May 27, 2022). This Court should do the same.

In this appeal, Plaintiffs continue to rely upon the district court opinion from Colorado in *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Col. 2021), (Appellants' Br, pp 28–29, 32, 35, 37–41), but this reliance is misplaced. First, it is worth noting that the court in that case also held that the claim that "purportedly bloated voter rolls could lead to fraudulent votes, which could diminish or dilute the individual plaintiffs' votes and have caused such a fear" was both a generalized grievance and hypothetical, and so did not support the plaintiffs' standing. *Id.* at 1103 ("[Plaintiffs'] 'subjective fear' of a diminished vote 'does not give rise to standing.' "). Plaintiffs, however, have never addressed this part of the court's opinion or reconciled it with their identical allegations.

But more importantly, the Colorado district court's holding concerning the "loss of confidence" was based entirely on its conclusion that the U.S. Supreme Court has recognized the " 'independent significance' of public confidence in the electoral process because it 'encourages citizen participation in the democratic process.' " *Id.* at

38

1104.  The district court's conclusion about this "independent significance" was based on one sentence from *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).  But that case had nothing to do with individual standing, let alone standing based upon a subjective loss of confidence in elections.  Instead, the "independent significance" of public confidence was identified by the Court as a *state interest* justifying the alleged burdens imposed upon voters by requiring them to present photo identification.  *Marion Cnty*, 553 U.S. at 196.  The Supreme Court simply held that the "significance" of the public's confidence in elections was "independent" of the state's interest in preventing fraud.  *Id.*

Moreover, the Supreme Court's opinion addressed only "*public* confidence," not any one individual's confidence in elections.  *Id.* (emphasis added).  The Court's conclusion that public confidence in elections supported a state interest in photo identification requirements does little (if anything) to support the conclusion that an individual voter may base their standing upon their alleged lack of confidence.

Plaintiffs' citation to *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind., 2012) is similarly flawed.  The district court there

also relied only upon the reference to the "independent significance" of public confidence in *Marion Cnty.* for its conclusion that, "If the state has a legitimate interest in preventing that harm from occurring, surely a voter who alleges that such harm has befallen him or her has standing to redress the cause of that harm." *Id.* The district court cited no other authority for that conclusion. But nothing in *Marion Cnty* supports that leap in reasoning, and instead the body of Article III standing law weighs against it.

In addition, granting individual voters standing based upon a raw allegation that they have subjectively "lost confidence" in elections would open the door for standing to challenge virtually any possible action or inaction by government relating to elections. In short, standing would become available to anyone willing to simply allege a subjective loss of confidence in elections. This Court should decline Plaintiffs' invitation to undermine Article III standing based upon a misreading of a single sentence is one Supreme Court opinion.

But outside of the misapplication of a single sentence from the Supreme Court's opinion in *Marion Cnty.*, the individual Plaintiffs offered no actual legal authority supporting their claim to standing. As

even the Colorado district court recognized in *Judicial Watch*—

plaintiffs' claim that their votes "might" be diluted is too abstract and

generalized to support standing.  554 F. Supp. 3d at 1103.

Because Plaintiffs Jorritsma and Silvernail's subjective and

abstract fears regarding election integrity and the possible dilution of

their votes failed to set forth a concrete, particularized injury sufficient

to support standing, their claims were correctly dismissed.

### B.    The RNC did not allege a cognizable diversion-of-resources injury.

Like the individual Plaintiffs, the RNC must also establish the

three requisite elements of standing.  *Lujan*, 504 U.S. at 560–61.

Again, allegations of injuries that merely amount to "generalized

grievances about the conduct of Government," *Schlesinger,* 418 U.S. at

217, or "setback[s] to the organization's abstract social interests,"

*Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982), will not

suffice.

The RNC alleges it has "vital interests in protecting the ability of

Republican voters to cast, and Republican candidates to receive,

effective votes in Michigan elections," and that it brings this suit "to

vindicate its own rights in this regard, and in a representational

41

capacity to vindicate the rights of its members, affiliated voters, and candidates." (R. 1, Page ID # 3–4, ¶ 15.) However—as the District Court noted—the RNC's arguments in opposition to Defendants' motion to dismiss addressed only its organizational standing and failed to develop any argument addressing the elements of associational or representative standing. (R. 35, Page ID # 505). This Court deems issues not raised in opposition to dispositive motions forfeited. *Swanigan v. FCA US LLC,* 938 F.3d 779, 786 (6th Cir. 2019) (citing *Am. Copper & Brass, Inc. v. Lake City Indust. Prods.,* 757 F.3d 540, 545 (6th Cir. 2014)).

The RNC alleged that it and its members were concerned with the integrity of Michigan's elections due to its purported failure to conduct list maintenance, which increases the chance of voter fraud. (R. 1, Page ID # 4, ¶ 16.) It further alleged that it relies on voter registration lists to plan its activities, and that inaccurate lists may cause it to misspend money or resources. (*Id.*, ¶ 17.) The RNC further alleged that it "expended considerable time and resources investigating Defendants" alleged failure to comply with the NVRA. (*Id.*, Page ID # 6, ¶¶ 24–25.) And that Defendants purported NVRA violations "forced Plaintiffs to allocate additional resources and misallocate their scarce resources in

42

ways they otherwise would not have." (*Id.*, Page ID # 19, ¶ 95.)  The RNC thus plainly and explicitly based its standing on a "diversion of resources" theory.

But the RNC's or its members, voters, and candidates' concern over election integrity or vote dilution were just as speculative and generalized as those of Jorritsma's and Silvernail's, and similarly failed for the reasons already stated above.  The RNC can "no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977, 982 (6th Cir. 2020) (citation omitted).  A "plaintiff cannot create an injury by taking precautionary measures against a speculative fear." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020).

Indeed, at the time of the District Court's opinion, the Supreme Court had recently clarified its position on the "diversion of resources" theory:

> The [plaintiffs] respond that under *Havens Realty Corp. v. Coleman*, standing exists when an organization diverts its resources in response to a defendant's actions. That is incorrect. Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike,

43

provided they spend a single dollar opposing those
policies. *Havens* does not support such an expansive theory
of standing.

*FDA v. All. For Hippocratic Med.,* 602 U.S. 367, 395 (2024).  Instead,

the Supreme Court explained that the HOME organization in *Havens*

had standing not because of their spending but because, "*Havens's*

actions directly affected and interfered with HOME's core business

activities—not dissimilar to a retailer who sues a manufacturer for

selling defective goods to the retailer."  *Id.*

As noted by the District Court, this Court has already had the

opportunity to react to the Supreme Court's clarification.  (R. 35, Page

ID # 507.)  In *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 902

(6th Cir. 2024), this Court recognized that *Havens'* unusual facts "do not

support a categorical rule that allowing standing whenever an

organization diverts its resources in response to a defendant's actions."

Moreover, in that case*,* even before the Supreme Court's decision in *All.*

*For Hippocratic Med.*, this Court summarized two other significant

limits on the "diversion of resources" theory in *Havens*:  (1) it predated

the *Iqbal/Twombly* line of cases adopting a "plausibility" test in place of

the more lenient "general allegations" approach; and (2) *Havens* only

44

addressed standing to seek damages, and did not address standing to

seek an injunction (as Plaintiffs did here).  *Tennessee Conf. of the*

*NAACP*, 105 F.4th at 903–04.

Now, in the aftermath of clarifications by the both the Supreme

Court and this Court's own decisions, Plaintiffs in this case are

attempting to distance themselves from the "diversion of resources"

theory they obviously relied upon in drafting their complaint.  But,

what the RNC alleged in its complaint was that it had to spend time,

money, or resources to investigate or counteract Michigan's alleged lax

list maintenance.  That is no longer a viable claim to standing under

current law.

The RNC cannot create its own injury based on its decision to

spend time and money investigating the state's list maintenance

programs based on its speculative concerns of voter fraud and vote

dilution.  *See also Online Merchants Guild v. Cameron*, 995 F.3d 540,

547 (6th Cir. 2021) (concluding courts have "rejected assertions of direct

organizational standing where an overly speculative fear triggered the

shift in organizational resources"); *accord Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 416 (2013) (noting a plaintiff "cannot manufacture

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

At best, with respect to future or imminent harm, the RNC alleged only that it "*may* spend more resources" on items such as mailers, contacting voters, etc, and that it "*may* misallocate its scarce resources[.]" (R. 1, Page ID # 4, ¶ 17) (emphasis added). But, like the rest of the RNC's concerns, these speculative allegations are not sufficiently concrete for purposes of Article III standing. *See Online Merchants Guild*, 995 F.3d at 547.

In an attempt to escape its reliance on a "diversion of resources" theory that no longer supports its standing, RNC argues that it has been harmed by Defendants supposed failure to provide the information that RNC desires and needs. (Appellants' Br., p 15.)

The problem with the RNC's argument is that its argument is more substantive than the allegations upon which it relies. While RNC wants to argue that its "daily operations" were "stymied," that is not what they alleged. *Id.* Instead, what the RNC alleged on the cited page of its complaint was merely that it relies on "registration lists" for planning and budgeting:

> In addition, the RNC relies to determine its plans and budgets.  The RNC relies on registration lists to estimate voter turnout, which informs the number of staff the RNC needs in a given jurisdiction, the number of volunteers need to contact voters, and how much the RNC will spend on paid voter contacts.  *If* voter registration lists include names of voters who should no longer be on the list, the RNC *may* spend more resources on mailers, knocking on doors, and otherwise trying to contact voters, or it *may* misallocate its scarce resources among different jurisdictions.

(R. 1, Page ID # 4, Compl., ¶ 17) (emphasis added).  The RNC did not allege that its operations were *actually* harmed, and instead the supposed injury is framed as a hypothetical rather than any concrete harm.  In fact, the RNC did not even allege that any money actually *was* misspent.

Even in the RNC's arguments before this Court, where it broadly suggests that its operations were "stymied," it fails to explain exactly how.  And while it generally concludes that having to "change campaign plans and strategies" is not a trivial injury, it does not say that any such change was necessary or actually occurred in the RNC's operations in Michigan.  The RNC's sweeping arguments simply do not match its much more modest allegations.  Also, while the RNC exerts much effort trying to suggest that rejecting its standing here would create a split with the Fourth Circuit's decision in *RNC v. N.C. Bd. of Elections*, 120

47

F.4th 390, 397 (4th Cir. 2024), that argument does not withstand close examination of the allegations that the Fourth Circuit found determinative.

In that case, the Fourth Circuit expressly relied upon allegations that the RNC "already spent significant resources" and that the RNC's voter outreach efforts in North Carolina "have been and will continue to be significantly stymied." *Id.* But those allegations are absent from the complaint in this case. More pointedly, the complaint does not allege that RNC's operation actually was obstructed or impaired—only that it *might* be spending more money than necessary. This is notably different than how the Supreme Court in *All. For Hippocratic Med.* described the "unusual" facts in *Havens*, in which "Havens gave HOME's employees false information about apartment availability," and that "HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'" 602 U.S. at 395. Here, RNC has not alleged any "perceptible" impairment to its operations.

Finally, Plaintiffs never sought to amend their complaint after Defendants' motion to dismiss identified the shortcomings of their

allegations—indeed, they declined to do so even after an explicit invitation from the District Court to amend their pleadings. (R. 22, Page ID # 325) ("Without expressing any view as to the merits of the motion, the Court will afford Plaintiffs the opportunity to cure the allegedly inadequate pleading by granting Plaintiffs leave to file an amended complaint, as allowed by Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure."). The Court gave Plaintiffs 21 days to file an amended complaint. But Plaintiffs elected not to cure the deficiencies of their pleading, and so the Court proceeded to decide the motion to dismiss. As a result, Plaintiffs are poorly positioned to request that the deficiencies of their pleading be liberally construed, or to complain that they were not permitted to amend their complaint after the District Court decided the motion to dismiss. (*See* Appellants' Br, pp 12, 21, 27, 44.)

The RNC's allegations failed to establish its standing beyond a mere possibility that it might have to spend money. That is no longer sufficient to establish standing—if it ever was. Because the RNC's speculative concern that it would be required to divert resources failed

49

to set forth a concrete, particularized injury sufficient to support

standing, its claims were properly dismissed for want of standing.

## II. Plaintiffs failed to state a plausible claim for relief under the NVRA.

### A. Plaintiffs failed to state a viable claim that Michigan has failed to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official voter lists.

Under the NVRA, a state must "conduct a general program that

makes a *reasonable effort* to remove the names of ineligible voters from

the official lists of eligible voters by reason of: (A) the death of the

registrant; or (B) a change in the residence of the registrant, in

accordance with subsections (b), (c), and (d) [of]" 52 U.S.C. §

20507(a)(4)(A) –(B) (emphasis added).

In the sole count of the complaint, Plaintiffs argued that

Defendants failed to make reasonable efforts to conduct voter list

maintenance programs, in violation of Section 8 of the NVRA. (R. 1,

Page ID # 19–20, ¶¶ 96–100.) Plaintiffs' claims rested on allegations

that a comparison of registered voters in 53 counties showed voter

registrations at or above 100 percent of the eligible population, and

another 23 counties had voter registrations rates above 90 percent of

the eligible population.  (R. 1, Page ID # 11–12, ¶¶ 48–49.)  But these allegations were based entirely on a raw comparison of census survey data to the *total* (not active) number of records in Michigan's QVF (which, as discussed further below, is a troubled comparison), leading Plaintiffs to conclude that there are more registered voters than the voting-age population in these counties.  Regardless, Plaintiffs did not identify *a single voter* in any Michigan county that was ineligible to be registered but nonetheless appeared as an active voter in the QVF.

On its face, the premise of Plaintiffs' complaint was that they believed Michigan might be capable of improving its program to remove ineligible voters.  However, at no point in the complaint did Plaintiffs contend that Michigan has *no* program to remove ineligible voters.

To the contrary, Plaintiffs' complaint admitted that Michigan does have a program for the removal of ineligible voters from the official list of registered voters.  Plaintiffs admitted in ¶ 67 that Michigan sent over 500,000 confirmation notices to voters in a two-year period.  (R. 1, Page ID # 14, ¶ 67.)  Plaintiffs further admitted that Michigan cancelled 485,916 registrations in that same two-year period.  (R. 1, Page ID # 16, ¶ 68.)  The essence of Plaintiffs' claim, therefore, was that Michigan's

51

efforts failed to satisfy the statutory requirement of making a "reasonable effort" to remove ineligible voters.

There are few cases in which federal courts have examined what is required for a "reasonable effort" to remove ineligible voters under NVRA, but the District Court in this case has decided one of them.  In an opinion issued in the same year as this complaint, the District Court rejected a claim that Michigan's list maintenance program failed to make a reasonable effort to remove ineligible (deceased) voters, and in so doing recognized that "Congress did not establish a specific program for states to follow for removing ineligible voters, and the Sixth Circuit has not yet addressed what 'a reasonable effort' entails." *Public Int. Legal Found. (PILF) v. Benson*, __ F. Supp. 3d __ (W.D. Mich. 2024); 2024 WL 1128565 (March 1, 2024).[19]  However, in that earlier opinion, the District Court also followed the Eleventh Circuit's holding in *Bellitto v. Snipes*, 935 F.3d 1192, 1204–05 (11th Cir. 2019), which concluded that "a jurisdiction's reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable

---

[19] PILF's appeal remains pending before this Court in Case No. 24-1255.

effort," and that "[t]he state is not required to exhaust all available methods for identifying deceased voters; it need only use reasonably reliable information to identify and remove such voters." *See PILF*, 2024 WL 1128565, at * 10.  In that case, the District Court then concluded that NVRA did not require states to operate perfect or exhaustive programs to remove ineligible voters:

> Even assuming arguendo that PILF's suggestions have merit, the NVRA requires only a "reasonable effort," not a perfect effort, to remove registrants who have died. PILF's identification of areas for improvement does not serve to demonstrate that Michigan's multilateral process for the removal of deceased registrants from the QVF does not meet the threshold of a "reasonable effort."

*Id.* at *11.  Notably, in that case, the court also observed that "federally collected data shows that Michigan is consistently among the most active states in the United States in cancelling the registrations of deceased individuals." *Id.* at *4.

But even putting aside the District Court's own recent experience with Michigan's list maintenance programs, other cases addressing NVRA's removal program requirements likewise do not support Plaintiffs' claims in this case.  In *Pub. Int. Legal Found. v. Boockvar*, the Pennsylvania District Court denied a motion for preliminary

53

injunction filed by PILF that sought to compel the removal of over 21,000 "potentially deceased" voters from the Pennsylvania voter rolls. 495 F. Supp. 3d 354, 356–57 (M.D. Penn., Oct. 20, 2020).  In so holding, the Court concluded "the NVRA does not require perfection," and that "[w]ithout allegation, let alone proof, of a specific breakdown in Pennsylvania's voter registration system, we cannot find that the many procedures currently in place are unreasonable."  *Id. at* 359.

Plaintiffs here, however, failed to allege any specific breakdown in Michigan's removal program.  Indeed, even the complaint's request for relief failed to demand that Defendants make any specific changes to Michigan's program, opting instead for a request for a vague injunction that merely restated the statute and would have required only that Defendants "develop and implement reasonable and effective registration list-maintenance programs."  (R. 1, Page ID # 20.)

The essence of Plaintiffs' claim reduces to a vague assertion that Michigan's program is imperfect in unspecified ways, or that the program could be improved.  However, that is insufficient to state a claim that Michigan has not made a "reasonable effort" as required by NVRA.

54

In this respect, Plaintiffs' claim is distinguishable from the *Pub. Int. Legal Found. v. Benson* case. *See* 2022 WL 21295936 (W.D. Mich, Aug. 25, 2022). As noted above, while the court ultimately found Defendant's program reasonable at summary judgment in that case, the District Court denied Defendant's motion to dismiss because the plaintiff had at least purported to provide specific data identifying thousands of "potentially deceased" voters by name and alleging that Michigan had done "nothing about it." *Id*. That is not so here. Plaintiffs here did not allege that they identified any individual ineligible voters, or any specific defects in Michigan's program. On the face of the complaint, Plaintiffs failed to state a claim for a violation of NVRA, and the complaint was properly dismissed.

But moreover, Plaintiffs' allegations themselves rested entirely on supposition and inferences. For example, in ¶ 61, Plaintiffs alleged that "several Michigan counties have inactive registration rates of 15% or greater, well above national averages." (R. 1, Page ID # 13, ¶ 61.) Plaintiffs then alleged that "[h]aving a high percentage of inactive registrations is an indication that a state or jurisdiction is not removing inactive registrations after two general federal elections." (R. 1, Page

ID # 13, ¶ 62.)  But, in order for this allegation to support Plaintiffs'

claim that Michigan's list maintenance program is deficient, they would

also need to have alleged—and they did not—that the inactive

registrations have not *already* been flagged by Defendants for

cancellation following two federal elections.  Yet information on the

Michigan Department of State website already addressed this very

point:

> State and local election officials were able to identity a
> significant number of registered voters who appeared to
> have changed address through the statewide mailing of
> absent voter ballot applications in 2020, the first statewide
> election mailing in at least a decade. State and local officials
> used applications that were returned as undeliverable to
> mark voters as inactive and send notices of cancellation in
> 2021 and without action by these voters the registrations
> will be cancelled after the two-federal-election waiting period
> expires in 2024. Because of this, many more voter
> registrations were identified and will be cancelled after 2024
> than after 2022.[20]

The "high number" of inactive registrations, therefore, are not a

reflection of a failure of Michigan's program, but instead were the *result*

---

[20] *See* Voter registration cancellation procedures, available at
https://www.michigan.gov/sos/~/link.aspx?_id=0CA77C36E2D44E0DBC
AB875DE164507F&_z=z (accessed February 25, 2025).

of Michigan's additional efforts to identify and slate ineligible voters for removal.

Regardless, for purposes of evaluating the sufficiency of Plaintiffs' complaint, it is not necessary to decide whether or not Plaintiffs' allegations are incorrect—it suffices merely to recognize that the allegations were little more than legal conclusions and inferences that the neither the District Court nor this Court need accept as true. *Total Benefits*, 552 F.3d at 434. Again, the inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Thus, in evaluating the sufficiency of a plaintiff's pleadings, the court may make reasonable inferences in the non-moving party's favor, "but [the court is] not required to draw plaintiffs' inference." *Aldana*, 416 F.3d at 1248. Here, as before the District Court, Defendants are appealing to the Court's experience and common

57

sense to reject claims that are unaccompanied by facts and based entirely on Plaintiffs' unsupported conclusions.

On the face of the complaint, Plaintiffs' allegations were simply insufficient to state a plausible claim for a violation of the NVRA. Plaintiffs' complaint, therefore, was correctly dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

On appeal, Plaintiffs raise three arguments purporting to identify "errors" made by the District Court. But since dismissals for failure to state claim are reviewed *de novo*, the District Court's conclusions as to the plausibility of Plaintiffs' claims necessarily yields to this Court's own assessment. Regardless, the supposed "errors" are unpersuasive.

In each of the three arguments raising supposed "errors," Plaintiffs claim that the District Court improperly required that they identify a specific flaw in Defendants' program for the removal of ineligible voters. (Appellants' Br, pp 39–43.) But these arguments misstate the District Court's opinion—the lower court imposed no requirement for specific reforms or specific defects. Instead, it simply *observed* that Plaintiffs failed to allege any specific breakdown in Michigan's program, while at the same time recognizing that the

essence of Plaintiffs' claim was merely that the program was "not reasonable." (R. 35, Page ID # 512.) This was followed by the court's determination that "conclusory assertions that merely parrot the language of the statute do not state a plausible claim," and that "Plaintiffs would need to allege some factual context to nudge their statutory violation claim across the line from conceivable to plausible." *Id.* (internal quotation omitted). The lack of factual context is where Plaintiffs' complaint failed—not merely because they failed to allege a specific flaw.

Regardless, the lack of any allegation identifying—or even outlining—how Michigan's program was falling short of the required "reasonable effort" is revealing. Simply put, Plaintiffs appear to be resorting to some variation of *res ipsa loquitur*—that is, something *must* be wrong with Defendants' program, but Plaintiffs do not know what it is. But Plaintiffs cite to no law or case anywhere in the nation supporting the position that such a rationale states a viable claim under the NVRA. Again, NVRA does not require a perfect program, but instead only a program that makes a "reasonable effort" to remove ineligible voters. Plaintiffs have made no allegation even attempting to

59

explain how Michigan's program does not make a "reasonable effort." Instead, Plaintiffs rely on conclusory allegations and insist that the Courts are obligated to accept their conclusions as true at "the pleading stage."

But federal courts are not obligated to accept as true legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555. While detailed factual allegations are not necessary, the allegations must be sufficiently detailed to create more than speculation of a cause of action. *Id*. A claim is plausible if the factual allegations are sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *HDC, LLC v. Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). Plaintiffs must state a claim that is not merely possible, but plausible. *Iqbal*, 556 U.S. at 678.

Plaintiffs insist that their mere allegation that the program is unreasonable must be accepted as true. But this Court is not obligated to accept Plaintiffs' conclusions. Further, Plaintiffs' inability to articulate any deficiency in the program, address the factual context, or explain what relief the Court might provide demonstrates that their claims are implausible, and thus legally insufficient.

**B.    Defendants' response letter further showed that Plaintiffs failed to state a plausible claim for a violation of the NVRA.**

Generally, when confronted with a Rule 12(b)(6) motion, the court considers only the pleadings, and ordinarily does not consider matters outside the pleadings. *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011). However, a court may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to one for summary judgment. *Id.* (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). Thus, within a Rule 12(b)(6) motion, a defendant may introduce certain documents if the plaintiff fails to do so. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (citations omitted). "Otherwise, plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Id.*

This is such a case, because Plaintiffs—for reasons known only to them—chose not to attach Defendants' response to their notice letter, in

which Defendants squarely addressed Plaintiffs' claims.  In the

complaint, Plaintiffs admit that they requested a response from

Defendants "fully describ[ing] the efforts, policies, and programs [they]

are taking, or plan to undertake before the 2024 general election to

bring Michigan into compliance" with Section 8 of the NVRA, and that

it asked Defendants to state "what policies are presently in place, or

will be put in place, to ensure effective and routine coordination of list

maintenance activities," and also "a description of the specific steps

[Defendants] intend to take to ensure routine and effective list

maintenance on a continuing basis beyond the 2024 election."  (R. 1,

Page ID # 17–18, ¶¶ 87–88.)  The complaint then alleges that

Defendants "failed to correct" the violations of NVRA described in

Plaintiffs' letter.  (R. 1, Page ID # 18, ¶¶ 90–91.)  The complaint

explicitly referred to Plaintiffs' demand for a response to their notice of

violations, expressly identified the information that Plaintiffs

demanded be included in that response and alleged that Defendants

"failed to correct" the violations.  In so doing, they both referred to

Defendants' response and placed that response at the center of their

claims.

Moreover, the response included the information Plaintiffs requested and directly addressed Plaintiffs' claims concerning list maintenance, and so the content of that response was central to Plaintiffs' claims in this case. So, the District Court and this Court may consider it because it was referred to in the complaint and is central to Plaintiffs' claims. *Bassett*, 528 F.3d at 430.

Even a cursory review of Defendants' response, however, reveals that Plaintiffs failed entirely to state a claim that Michigan's program for the removal of ineligible voters does not make "a reasonable effort." First, the response provides a detailed description of Michigan's program for the removal of ineligible voters, with citation to statutes and publicly available resource materials. (R. 19-3, Page ID # 317–318, Defs' MTD, Ex. 2, pp 2–3.) So, the response clearly explained the existence and structure of Michigan's program. Next, the response identified several steps Michigan has taken to improve its program and explained that Michigan's efforts have contributed to the cancellation of more than 700,000 registered voters between 2019 and 2023, and more than 500,000 registrations slated for future cancellation. (*Id.*, Page ID # 318, p 3.) The response then specifically pointed to the statewide

mailing that allowed state and local election officials to identify registered voters whose election mail was returned as undeliverable, and thereby triggered a cancellation countdown under Section 509aa, Mich. Comp. Laws § 168.509aa.  (*Id.*)  This part of the response alone should have alerted Plaintiffs to a flaw in their analysis concerning a "high percentage" of inactive registrations, but their later pleading made no attempt to reconcile their claims with the statutory process for cancelling registrations.  (*See* R. 1, Page ID # 13, ¶ 62.)

Next, the response discussed Michigan's participation in the ERIC program, which receives updated registration information from other states and can identify voters who have moved out of state, and also the effect of Michigan's automatic registration laws on how registration information is updated.  (R. 19-3, Page ID # 319, Defs' MTD, Ex. 2, p 4.) The response then also discussed other means used to identify and remove the names of deceased and duplicate voters.  (*Id.*)

Lastly, the letter directly responded to Plaintiffs' claims about registration statistics, Plaintiffs' figures on registration percentages, and that Plaintiffs appeared to be including both "active" and "inactive" voters when calculating the number of voters in various counties, and

64

then explained that "inactive" voters could not be removed without
following the requirements of federal law. (*Id.*, Page ID # 319–320, pp
4–5.) The response then provided the correct percentages of *active*
registered voters in each of the counties identified in Plaintiffs' letter.
(*Id.*) None of those counties have voter registrations exceeding 95%.
(*Id.*, Page ID # 320, p 5.)

In short, Defendants' response clearly established the existence
and scope of Michigan's program, identified specific steps taken to
improve and expand the program, and explained how Plaintiffs'
calculations were erroneous. But, despite having Defendants' response
for over three months before filing this lawsuit, Plaintiffs made no
attempt in their complaint to refute—or even address—the factual
information provided in Defendants' response. Plaintiffs' claims simply
could not be maintained in light of these facts, which the complaint
failed to dispute. The response letter made it clear that Michigan not
only has a comprehensive program to identify and remove the names of
ineligible voters from the official list of registered voters, but also that
program has removed hundreds of thousands of voters in the past few
years and is well on its way towards removing hundreds of thousands

more in the next few years.  Again, Plaintiffs did not allege any specific defect in Michigan's program and did not allege that they identified any ineligible voters who remain listed as "active" on Michigan's QVF. Plaintiffs, therefore, failed entirely to make allegations sufficient to state a plausible claim that Michigan's program has not made a "reasonable effort" as required by the NVRA, and so their complaint was correctly dismissed pursuant to Fed. R. Civ. Proc. 12(b)(6).

## CONCLUSION AND RELIEF REQUESTED

For these reasons, Defendants-Appellees Secretary of State Jocelyn Benson and Michigan Director of Elections Jonathan Brater respectfully request that this Honorable Court affirm the order of the District Court granting Defendants' motion to dismiss.

Respectfully submitted,

*s/Erik A. Grill*
Erik A. Grill (P64713)
Heather S. Meingast (P55439)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-
Appellees
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
grille@michigan.gov

Dated:  March 4, 2025

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of
Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding
the part of the document exempted by Federal Rule of Appellate
Procedure 32(f), this brief contains no more than 13,000 words.  This
document contains 12,936 words.

2.     This document complies with the typeface requirements of
Federal Rule of Appellate Procedure 32(a)(5) and the type-style
requirements of Federal Rule of Appellate Procedure 32(a)(6) because
this document has been prepared in a proportionally spaced typeface
using Word 2013 in 14-point Century Schoolbook.

*s/Erik A. Grill*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-
Appellees
Civil Rights & Elections Division
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
grille@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on March 4, 2025, the foregoing document was served on all parties or their counsel of record through the ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

*s/Erik A. Grill*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-
Appellees
Civil Rights & Elections Division
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
grille@michigan.gov

68

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 03/13/2024 | R. 1 | 1-28 |
| Proposed Intervenor-Defendants' Motion to Intervene | 03/22/2024 | R. 9 | 102-162 |
| Motion to Intervene by Non-Party League of Women Voters of Michigan | 04/04/2024 | R. 12 | 169-234 |
| Defendants' Motion to Dismiss | 04/15/2024 | R. 18 | 261-262 |
| Defendants' Brief in Support of Motion to Dismiss | 04/15/2024 | R. 19 | 263-320 |
| Order | 04/16/2024 | R. 22 | 325-326 |
| Unopposed Motion for Leave to File Amicus Curiae Brief | 05/06/2024 | R. 24 | 331-388 |
| Response in Opposition to Motion to Dismiss | 05/20/2024 | R. 27 | 395-445 |
| Defendants' Reply Brief in Support of Motion to Dismiss | 06/17/2024 | R. 30 | 450-468 |

| Order Granting DNC's Unopposed Motion for Leave to File Amicus Curiae Brief | 09/16/2024 | R. 34 | 484 |
|---|---|---|---|
| Opinion and Order | 10/22/2024 | R. 35 | 485-514 |
| Judgment | 10/22/2024 | R. 36 | 515 |
| Notice of Appeal | 11/08/2024 | R. 37 | 516-517 |